WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leland Todicheeney,<br><br>                    Plaintiff,<br><br>v.<br><br>Office of Navajo and Hopi Indian Relocation,<br><br>                    Defendant. | No. CV-21-08003-PCT-MTL<br><br>**ORDER** |

Pending before the Court is Plaintiff Leland Todicheeney's Motion for Summary Judgment (Doc. 14) and Defendant Office of Navajo and Hopi Indian Relocation's ("ONHIR") Cross Motion for Summary Judgment (Doc. 16). For the reasons that follow, Defendant's Cross Motion is granted and Plaintiff's Motion is denied.

**I.   BACKGROUND**

   **A.   The Settlement Act**

Prior to 1974, a parcel of land in northeastern Arizona, known as the "Joint Use Area," was occupied by both the Navajo and Hopi Nations. *Healing v. Jones*, 210 F. Supp. 125, 132 (D. Ariz. 1962), aff'd, 373 U.S. 758 (1963). In an attempt to resolve conflict between the tribes, Congress passed the Navajo-Hopi Settlement Act (the "Settlement Act") in 1974, which authorized the District Court of Arizona to divide the land into the Navajo Partitioned Lands ("NPL") and the Hopi Partitioned Lands ("HPL"). *See* Pub. L. No. 93-531, § 12, 88 Stat. 1716 (1974); *Clinton v. Babbitt*, 180 F.3d 1081, 1084 (9th Cir.

1999). The Settlement Act also created the ONHIR[1] to disburse benefits funds and to assist tribal members relocating to the other side of the partition. *Bedoni v. Navajo–Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1121–22 (9th Cir. 1989). To be eligible for benefits under the Settlement Act, a Navajo applicant must prove that he was a legal resident of the HPL as of December 22, 1974 and that he was the head of household at that time. *Laughter v. Office of Navajo & Hopi Indian Relocation*, CV–16–08196–PCT–DLR, 2017 WL 2806841, at *1 (D. Ariz. June 29, 2017). The applicant bears the burden of proving legal residence and head of household status. *See id.* (citing 25 C.F.R. § 700.147 (1986)).

**B.     Factual and Procedural History**

Plaintiff is an enrolled member of the Navajo Nation. (Doc. 10, Administrative Record ("AR") at 38.) Plaintiff was born June 27, 1960 and was raised in the Fingerpoint Valley in the Teestoh Chapter area on the HPL. (AR 38, 80, 101.) At age 18, Plaintiff began performing seasonal work outside of the Reservation, mostly brush pilling, for Mr. Kindle. (AR 102.) He was paid every two weeks by check, usually about three hundred dollars. (AR 104.) During the seasons where Plaintiff was not working for Mr. Kindle, he sometimes worked herding sheep or hauling wood both on and off the Reservation, earning two or three hundred dollars per month. (AR 107.) Plaintiff lived with his parents when he was not working for Mr. Kindle, usually in a structure near their homesite in the HPL. (AR 86–87, 89.) Once his parents moved off the HPL, Plaintiff stayed in a cabin next door to his parents' house. (AR 87.) The parties dispute when the Plaintiff's parents moved off the HPL. (Doc. 17 at ¶ 19.) Plaintiff asserts that his parents began to move in 1980 but did not complete their move until 1984. (Doc. 15 at ¶ 19.) OHNIR asserts that his parents moved in 1980. (Doc. 17 at ¶ 19.)

In February 2009 and again in September 2009, Plaintiff applied for relocation benefits under the Settlement Act. (AR 38–42, 49–53.) In June 2012, ONHIR denied Plaintiff's application based on its finding that Plaintiff was not the a "head of household" when he moved off the HPL land. (AR 60–61.) Plaintiff appealed. (AR 66.)

---

[1] The predecessor to the ONHIR was the Navajo-Hopi Indian Relocation Commission, or NHIRC. *See* 25 U.S.C. §§ 640d–11, 640d–12, 640d–13, 640d–14.

An Independent Hearing Officer ("IHO") held a hearing in Plaintiff's case in September 2014. (AR 76.) Both Plaintiff and the Eligibility and Appeals Branch of the ONHIR submitted post-hearing briefs. (AR 177–188, 122–142.) The IHO issued a written decision affirming the denial of benefits in December 2014. (AR 258–265.) The following month, ONHIR took final agency action on Plaintiff's application and concluded the administrative review process. (AR 272.) About six years later, Plaintiff filed a Complaint in this Court, seeking judicial review of the ONHIR's decision. (Doc. 1.)

## II.     LEGAL STANDARD

The Administrative Procedure Act ("APA") governs judicial review of agency decisions under the Settlement Act. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir. 1995). Under the APA, the Court may set aside an administrative agency's decision only if that decision was "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Bedoni*, 878 F.2d at 1122 (citing 5 U.S.C. § 706(2)(A), (E) (1982); *Walker v. Navajo–Hopi Indian Relocation Comm'n*, 728 F.2d 1276, 1278 (9th Cir. 1984)). "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Orteza v. Shalala*, 50 F.3d 748, 749 (9th Cir. 1995). When conducting "judicial review pursuant to the APA, 'summary judgment is an appropriate mechanism for deciding the legal question of whether [ONHIR] could reasonably have found the facts as it did.'" *O'Daniel v. Office of Navajo & Hopi Indian Relcoation*, No. 07-354-PCT-MHM, 2008 WL 4277899, at *3 (D. Ariz. Sept. 18, 2008) (citing *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)).

Under this standard, the Court applies a "narrow" and highly deferential standard of review:

> To make this finding the [C]ourt must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The [C]ourt is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), abrogated on

- 3 -

other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted).

In contrast to summary judgment in an original district court proceeding, the function of the Court in a review of an administrative proceeding "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engineering Co.*, 753 F.2d at 769. "Where evidence is susceptible of more than one rational interpretation, it is the [IHO's] conclusion which must be upheld; and in reaching his findings, the [IHO] is entitled to draw inferences logically flowing from the evidence." *Gallant v. Heckler*, 753 F.2d 1450, 1453 (1984) (citations omitted). Ultimately, the Court must affirm if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004)).

## III. ANALYSIS

### A. Extra-Record Material

Plaintiff attached seven exhibits to his motion for summary judgment (Ex. 4–9 and 11) that were not included in the administrative record. (Docs. 14-1, 14-2, and 14-5.) OHNIR objects to these extra-record documents because Plaintiff never filed a motion to supplement the record, but instead "attempts to circumvent Ninth Circuit law by simply attaching the improper documents." (Doc. 16 at 6–7, 15, *see also* Doc. 23 at 5–6.)

"[T]he focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The administrative record consists of both the documents compiled and submitted by the agency, but also of "documents and materials directly or indirectly considered by agency decision-makers." *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989). A district court may consider documents outside of the administrative record in four "narrowly construed" circumstances: when "(1) supplementation is necessary to determine if the agency has considered all factors and

explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency." *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). While "an agency must follow its own precedent or else explain any deviation, . . . previous decisions only serve this purpose if they carry precedential value in the case at hand." *Stago v. Off. of Navajo & Hopi Indian Relocation*, No. CV-20-08118-PHX-SPL, 2021 WL 4950349, at *3 (D. Ariz. Oct. 25, 2021). Accordingly, the Court will consider only those exhibits if "they set forth ONHIR policy or if they involve facts indistinguishable from the instant case." *Id.*

Exhibits 4 through 9 are excerpts of the administrative record from other ONHIR decisions. (Docs. 14-1, 14-2.) Plaintiff asserts that these exhibits are necessary to this Court's analysis because they have "precedential effect," and the Court must ensure that all persons displaced under the Settlement Act are treated with fairness and consistency. (Doc. 20 at 12.) Here, the excerpts of the administrative record provide the Court with no way to determine what evidence was before the IHO in each case. Moreover, the Court has no way of determining "that Plaintiff's hand-picked sample of cases represents a settled course of adjudication and a general policy by which Defendant's exercise of discretion will be governed." *Whitehair v. Off. of Navajo & Hopi Indian Relocation*, No. CV17-08278-PCT-DGC, 2018 WL 6418665, at *3 (D. Ariz. Dec. 6, 2018) (internal quotation marks omitted). The Court will not consider these exhibits.

Plaintiff's Exhibits 3 and 13 were already part of the administrative record because they were included in Plaintiff's post-hearing memorandum. (AR at 201–206, 208–212.) Likewise, the E. Susan Crystal Memorandum was also part of the administrative record. (AR 230–233.) Thus, the Court will consider these Exhibits.

Exhibit 11 is the Office of the Inspector General's report on the "Status of the Office of Navajo and Hopi Indian Relocation's Appeal on Eligibility Determination Cases." (Doc. 14-5 at 50, Ex. 11.) The report was published in September 2020. (*Id.*) Plaintiff's denial of benefits was issued in December 2014, about six years prior. (AR 258–265.)

Accordingly, it is impossible for the IHO to have considered the report, and Plaintiff does not make any argument that the report should be admitted under the other *Fence Creek* factors. (Doc. 20 at 10–12.) The Court will not consider this exhibit. *See Stago*, 2021 WL 4950349 at *3 (applying *Fence Creek* and refusing to consider a Department of the Interior Appeals Report).

Likewise, there is no need for the Court to refer to Plaintiff's Exhibit 16, which is the Ninth Circuit decision in *Shaw*, or this Court's decision in *Torpey*, Exhibit 12, or *Herbert*, Exhibit 14. (Doc. 20-1, Ex. 12, 14, 16.) In contrast, however, the Court will consider Plaintiff's Exhibit 15. Plaintiff cites *In re Minnie Woodie* to show the ONHIR's policy on customary use policies. (Doc. 20 at 12–14.) The Ninth Circuit and other judges in this district have held that "an applicant's use of land for traditional activities qualifies the applicant as a legal resident, which comes not from federal regulations but from the *Minnie Woodie* decision." *Id.* (citing *Shaw*, 860 Fed. App'x. at 494–95 n.1) (Bade, J., dissenting). Because the IHO was required to consider the *Minnie Woodie* decision and its holding, the Court finds Plaintiff's Exhibit 16 to be a part of the administrative record. *Id.*

### B. Move-Off Date

The parties do not dispute that Plaintiff was an HPL resident until 1980. (Doc. 14 at 8, Doc. 16 at 12.) Plaintiff asserts that he was an HPL resident until 1984 when his parents completed their move. (Doc. 14 at 8.) To establish he is qualified for benefits, Plaintiff bears the burden of showing he was the head of a household at the time he moved off the HPL. 25 C.F.R. § 700.147(a), (b). As described in the comments to the Settlement Act, the term "residence" in the final rule "requires an examination of a person's intent to reside combined with manifestations of that intent." Commission Operations and Relocation Procedures; Eligibility, 49 FR 22277–01 (May 29, 1984). This element of subjective intent allows that "[a]n individual who was, on December 22, 1974, away from the land partitioned to the Tribe of which he/she is not a member may still be able to prove legal residence." *Id.* Manifestations of intent may include ownership of livestock, ownership of improvements, grazing permits, livestock sales receipts, homesite leases,

medical records, school records, employment records, mailing address records, banking records, voting records, census data, court records, the Joint Use Area roster, and any other relevant data. 49 Fed. Reg. 22, 278.

At the hearing, the parties stipulated that Plaintiff's parents moved off in June of 1980, they maintained their HPL homesite primarily for ceremonies, "and there was a cornfield" until 1982. (AR at 118–19.) But Plaintiff asserts his residence was the HPL homesite until 1984, and the "temporarily away" exception should apply for the times he was working for Mr. Kindle. (Doc. 14 at 9.)

The IHO held "[t]he parties stipulated that the move off date for applicant's family's relocation was June 1980." (AR at 259.) The IHO also noted that Plaintiff's family participated in a ceremony at the HPL homesite in 1982, but "that residence had not been [Plaintiff's] legal residence for two years or more." (*Id.*) This finding was adequately supported by evidence in the record. First, the parties stipulated that Plaintiff's parents moved off in 1980. (AR at 118–19, 259.) Plaintiff testified that he lived next door to his parents for all of his life. (AR at 102.) Besides the stipulation that the HPL homesite had a cornfield until 1982 and Plaintiff himself testifying that his family owned "only like five" livestock, Plaintiff provided no testimony regarding other manifestations of intent to reside on the HPL. (AR 114.) Moreover, Plaintiff provides no evidence besides unsupported testimony for a move-off date later than 1982. And Plaintiff provides no evidence of continuously returning to the HPL homesite after 1980. *Manygoats v. Off. of Navajo & Hopi Indian Relocation*, 735 F. Supp. 949, 953 (D. Ariz. 1990) (finding that an applicant was not "temporarily away" because his presence at the homesite "was not infrequent, of short duration or for social purposes"). Moreover, a stipulation is "in truth, a substitute for evidence, in that it does away with the need for evidence." *United States v. Smith*, 86 F.3d 1165, 1996 WL 267325, at *3 (9th Cir. 1996). For these reasons, the IHO's decision Plaintiff moved off HPL in 1980 was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Begay v. Off. of Navajo & Hopi Indian Relocation*, 305 F. Supp. 3d 1040, 1047–48 (D. Ariz. 2018), aff'd, 770 F. App'x

801 (9th Cir. 2019); *see also Laughter*, 2017 WL 2806841, at *3.

### C. Head of Household

Plaintiff challenges the IHO's determination that he was not a self-supporting head of household. (Doc. 14 at 6–8.) The IHO held that Plaintiff did not meet the head of household requirement in 1980, the move off date, because Plaintiff's claims regarding the amount of money he made in the years before he moved off the HPL lacked any documentary support. (AR at 263–264.)

To be considered a head of household, an applicant must show that she was a "single person who at the time his/her residence on land partitioned to the Tribe of which he/she is not a member actually maintained and supported him/herself[.]" 25 C.F.R. § 700.69(a)(2). The applicant bears the burden of proving his/her head of household status. *Id.* § 700.147(b). Moreover, "to qualify as a Head of Household, the individual must have been a Head of Household as of the time he/she moved from the land partitioned to a tribe of which they were not a member." *Id.* § 700.69(c). Thus, to qualify for benefits, Plaintiff must prove that he was the self-supporting head of household in 1980. The ONHIR's regulations do not set forth a specific dollar amount an applicant must have earned in order to qualify as self-supporting, but earnings of at least $1,300 per year create a *prima facie* showing of self-support. *Benally v. Office of Navajo & Hopi Relocation*, No. 13-CV-8096-PCT-PGR, 2014 WL 523016, at *2 (D. Ariz. Feb. 10, 2014).

The IHO did not err in finding that Plaintiff failed to prove that he was earning above the $1,300 threshold by 1980. Plaintiff asserts he was earning about $300 per paycheck for several months while he worked for Mr. Kindle. (AR 104.) But none of this income was documented in any way. Furthermore, Plaintiff did not indicate that he worked for Mr. Kindle on his initial application, and given the fact that Mr. Kindle was a government contractor, social security withholdings should have been itemized. (*See* AR 38–42, 49–53.) Given the total lack of support for Plaintiff's claimed income, the IHO did not err in its determination. *Id.* at *3 (affirming the IHO's finding that an applicant was not the head of household because his claimed earnings were "totally unsupported by

contemporaneous documentation" and were thus "not substantiated by the evidence").

The IHO properly discounted contradictory testimony from Plaintiff and his family. While Plaintiff, his sister, and his uncle all testified that Plaintiff worked for Mr. Kindle, each provided different years when he began this work and for how long he worked there. Plaintiff asserts he also made money through herding sheep and doing chores like hauling firewood for neighbors. (AR 114.) But during that time, Plaintiff was not self-supporting; he relied on his parents for food and shelter. (AR 106.) *See Benally*, 2014 WL 523016, at *2–3 (affirming the IHO's finding that an applicant was not self-supporting where he relied on other sources for food and shelter).

Plaintiff points to several cases where he argues the ONHIR reached opposite decisions. While it is true that the ONHIR must follow its own precedent, this requires "that the agency appl[y] the law consistently to cases with similar material facts; it does not require the agency find the same facts for different parties, in different proceedings, and based on different evidence." *Daw v. Off. of Navajo & Hopi Indian Relocation*, No. CV-19-08212-PCT-SMB, 2020 WL 5632121, at *4 (D. Ariz. Sept. 21, 2020). The Court finds that the IHO's decision was not arbitrary and capricious and was supported by substantial evidence.

### D. Credibility Findings

Plaintiff also argues that the IHO's credibility findings were not supported by substantial evidence. (Doc. 14 at 11.) The IHO found Plaintiff and his two witnesses, his sister and his uncle, to be not credible. "When the decision of an ALJ rests on a negative credibility evaluation, the ALJ must make findings on the record and must support those findings by pointing to substantial evidence on the record." *Ceguerra v. Secretary of Health & Human Services*, 933 F.2d 735, 738 (9th Cir. 1991) (citation omitted). Thus, "if an ALJ has grounds for disbelieving material testimony, it is both reasonable and desirable to require the ALJ to articulate those grounds in the original decision." *Id.* at 740 (citing *Varney v. Secretary of HHS*, 859 F.2d 1396 (9th Cir. 1988)). Nevertheless, an agency's "credibility findings are granted substantial deference by reviewing courts." *De Valle v.*

*I.N.S.*, 901 F.2d 787, 792 (9th Cir. 1990) (citations omitted). The Ninth Circuit has recognized that the IHO alone is "in a position to observe [a witness]'s tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence. He is . . . uniquely qualified to decide whether an [witness]'s testimony has about it the ring of truth." *Sarvia–Quintanilla v. U.S. I.N.S.*, 767 F.2d 1387, 1395 (9th Cir. 1985).

The IHO found Plaintiff's testimony about his claimed employment or earnings noncredible because "no records exist to show any earnings from any of the described activities." (AR 261.) Similarly, the IHO found Plaintiff's sister's testimony regarding the amount of money that Plaintiff earned to be "not credible" because "there is no documentation." (AR 260.) And finally, for the same reason, the IHO found Plaintiff's uncle to be "not a credible witness" because "he didn't remember when he started working for Kindle, he did not remember for how many years he worked for Kindle and he did not have any records, ledgers, accounts, tax returns or any other documents showing any earnings from working for Kindle." (AR 260–61.) The IHO's analysis was a paragraph per witness, and he limited his credibility findings to the claimed income of Plaintiff. (*Id.*) The IHO also found that the uncle's testimony and Plaintiff's testimony regarding the type and location of work they performed for Mr. Kindle was "stunningly different." (AR at 264.) Likewise, Plaintiff's sister's testimony "ranged far and wide and was thoroughly inconsistent." (*Id.*) The Court finds that these reasons are specific and cogent, and therefore the IHO's credibility findings were supported by substantial evidence and entitled to deference by this Court. *See Begay*, 305 F.Supp.3d at 1050.

Plaintiff contends that the IHO's credibility findings were arbitrary and capricious because at Plaintiff's sister's hearing, the IHO found the sister to be credible. (Doc. 14 at 14.) But this argument rests on a collateral estoppel theory, which is expressly disallowed. *United States v. Mendoza*, 464 U.S. 154, 155 (1984) ("[T]he United States may not be collaterally estopped on an issue . . . adjudicated against it in an earlier lawsuit brought by a different party."). Nor must the ONHIR make the same credibility determination in two

different cases. *Daw*, 2020 WL 5632121, at *4 (concluding that though "the agency [must] appl[y] the law consistently to cases with similar material facts; it does not require the agency find the same facts for different parties, in different proceedings, and based on different evidence").

### E.    Trustee Obligations

Finally, Plaintiff contends that the ONHIR's adverse decision violated the government's federal trust responsibilities and the duty of good faith. (Doc. 14 at 16–17, Doc. 20 at 15–16.) Plaintiff argues that the ONHIR knew he had reached the age of 18 by 1978, but "they did not advise him to apply as a separate household and instead included him in his parent's application." (Doc. 20 at 16.)

The Settlement Act expressly grants trustee authority to the government, and there is a "longstanding general trust obligation that has dominated Government interaction with Native Americans." *Bedoni*, 878 F.2d at 1124. And the ONHIR has "an affirmative duty to manage and distribute the funds appropriated pursuant to the Settlement Act such that the displaced families receive[] the full benefits authorized for them." *Stago*, 2021 WL 4950349, at *6 (D. Ariz. Oct. 25, 2021) (quoting *Bedoni*, 878 F.2d at 1124) (internal quotations omitted). But the government's trust obligation does not affect this Court's analysis of Plaintiff's individual application and does not give ONHIR an affirmative duty to disburse funds to Plaintiff. *Id.* ("[W]hether ONHIR has a duty to disburse benefits to Plaintiffs flows from the IHO's decision, but ONHIR's duty to disburse benefits to eligible applicants does not dictate Plaintiffs' eligibility."). Moreover, the record is clear that ONHIR *did* advise Plaintiff to apply for benefits; in fact, the ONHIR sent Plaintiff a letter in February 2009, several weeks before he applied. (AR 28, 38.) This letter included an application and advised him that he "might be eligible for relocation benefits based on information in [its] files." (*Id.*)

### IV.    CONCLUSION

For the reasons stated above, Defendant ONHIR's decision to deny relocation benefits was not arbitrary, capricious, or an abuse of discretion. It was in accordance with

- 11 -

law and supported by substantial evidence. Therefore, Defendant is entitled to summary judgment.

Therefore,

**IT IS ORDERED denying** Plaintiff's Motion for Summary Judgment.  (Doc. 14)

**IT IS FURTHER ORDERED granting** Defendant's Cross Motion for Summary Judgment.  (Doc. 16.)

**IT IS FINALLY ORDERED** directing the Clerk of the Court to enter judgment accordingly and close this case.

Dated this 16th day of May, 2022.

Michael T. Liburdi
United States District Judge